THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID F. PIETRYKA, HELEN　　　　　　:
PIETRYKA, and DAVID P. PIETRYKA　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Plaintiffs,　　:　　3:24-CV-00915
　　　　　　　　　　　　　　　　　　　　　:　　(JUDGE MARIANI)
　　　　v.　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
UNITED STATES OF AMERICA,　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Defendant.　　:

## MEMORANDUM OPINION

Presently before the Court is Defendant United States of America's motion to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter

jurisdiction. (Doc. 5). For the reasons that follow, Defendant's motion will be granted in part

and denied in part.[1]

## I.　　INTRODUCTION & PROCEDURAL HISTORY

Plaintiffs David F. Pietryka, Helen Pietryka, and David P. Pietryka initiated this action

against the Defendant United States of America by filing a complaint (the "Complaint") on

June 4, 2024. (Doc. 1). Plaintiffs bring claims under the Federal Tort Claims Act ("FTCA"),

28 U.S.C. §§ 2671 *et seq.* and the Pennsylvania Wage Payment & Collection Law

---

[1]　　This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).

("PWPCL").  On August 12, 2024, Defendant filed a motion to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  (Doc. 5).

## II.    FACTUAL BACKGROUND

The Complaint alleges the following facts:

Helen Pietryka has been employed full-time by the Tobyhanna Army Depot ("TYAD")

for approximately twenty-four (24) years.  (Doc. 1 at ¶ 10).  Most recently, her position with

the TYAD was "Branch Chief (Supervisory Production Management)."  (*Id.* at ¶ 11).  "At all

times relevant hereto (aside from the improper lapse in coverage)" Mrs. Pietryka has been

enrolled in the TYAD Government-Wide Service Benefit Plan through the BlueCross

BlueShield Federal Employee Program ("BCBS").  (*Id.* at ¶ 12).

On July 22, 2021, Mrs. Pietryka fell in a stairwell while on duty and broke her right

arm.  (*Id.* at ¶ 13).  She took an initial forty-five (45) days off from work, and then went on

Worker's Compensation ("WC").  (*Id.* at ¶ 14).  "Her WC began on September 13, 2021, and

ended on November 8, 2021."  (*Id.* at ¶ 15).  Mrs. Pietryka returned to work full-time on

November 9, 2021.  (*Id.* at ¶ 16)

On January 12, 2022, David P. Pietryka, Mrs. Pietryka's son, who was covered

under her insurance plan, attempted to schedule a necessary surgery, but learned that his

mother's government-issued health insurance had been terminated at some point in time.

(*Id.* at ¶ 17).  Mrs. Pietryka "immediately contacted BCBS, who told her that TYAD

terminated her insurance on November 9, 2021, despite Mrs. Pietryka returning to work that

day." (*Id.* at ¶ 18). She further learned that the grace period for cancellation of her BCBS health insurance was thirty-one (31) days, or until December 10, 2021. (*Id.* at ¶ 19). "Mrs. Pietryka never received a cancellation notice from TYAD, or a COBRA notice." (*Id.* at ¶ 20).

Mrs. Pietryka also contacted TYAD Human Resources as soon as she learned her insurance was cancelled, as she was having health issues that required medical treatment and she needed prescriptions that were previously covered by her health insurance. (*Id.* at ¶ 21). She "had to abruptly stop taking these medications due to lack of insurance coverage, which was detrimental to her health." (*Id.* at ¶ 22). David F. Pietryka, Mrs. Pietryka's husband, was also covered by her government-issued health insurance. (*Id.* at ¶ 23). He has Type II diabetes and is insulin-dependent. (*Id.*). "When the insurance was terminated, David F. Pietryka was unable to obtain his medications, including Humalog, due to the high out-of-pocket costs of these medications." (*Id.* at ¶ 24). He "requires approximately 3,960 units/month (66 units in the morning and 66 units at night each day), which would total $5,505/month." (*Id.* at ¶ 25). David F. Pietryka further had to a cancel a January 25, 2022 appointment due to lack of insurance coverage. (*Id.* at ¶ 26).

On January 13, 2022, Stacey Royce, TYAD Human Resources Assistant, wrote an email to Rebekkah Morganweck, TYAD Lead Human Rights Specialist, stating that she spoke with the Army Benefits Center ("ABC") regarding Mrs. Pietryka's insurance cancellation. (*Id.* at ¶ 27). Ms. Royce wrote that ABC Human Resource Benefit Specialist looked up Mrs. Pietryka filed and did not see a Federal Employees Health Benefits Program

Form SF-2810 (Notice of Change in Health Benefits Enrollment) "to terminate Mrs. Pietryka's health insurance which, Ms. Royce stated, was <u>required</u> for cancellation." (*Id.* at ¶ 28) (emphasis in original). "ABC recommended that Mrs. Pietryka call BCBS again to find out why her insurance was cancelled, and what form(s) were received to terminate her coverage." (*Id.* at ¶ 29). The ABC further recommended that Mrs. Pietryka check her leave and earning statement ("LES") to determine if she was still paying for her insurance plan. (*Id.* at ¶ 30).

On January 14, 2022, Mrs. Pietryka wrote to Ms. Morganweck informing her that she called BCBS but they did not have access to any forms. (*Id.* at ¶ 31). BCBS "could only see that Mrs. Pietryka's coverage was terminated on November 9, 2021 at 12:01 a.m., and nothing else." (*Id.* at ¶ 32). BCBS further told Mrs. Pietryka that the likely reason for the termination was "that she was still hard coded as WC on November 9, 2021, despite returning to work that day." (*Id.* at ¶ 33). Mrs. Pietryka's LES for pay periods ending on December 18, 2021 and January 1, 2022 show that she paid $1,686.75 for health insurance, but she did not have health insurance during those times. (*Id.* at ¶ 34). "In closing, Mrs. Pietryka stressed, 'I cannot be without insurance.'" (*Id.* at ¶ 35). Mrs. Pietryka "could not refill necessary medications, such as oxycodone and duloxetine, due to her lack of insurance through no fault of her own." (*Id.* at ¶ 36). She further has voiced these concerns, among others, during appointments with medical providers. (*Id.* at ¶ 37).

On January 16, 2022, Mrs. Pietryka was taken by ambulance to Moses Taylor Hospital in Scranton, Pennsylvania for a medical issue. (*Id.* at ¶ 38). "Specifically, Mrs. Pietryka developed a urinary tract infection ("UTI") in December 2021 and could not obtain the prescription medication needed to treat it due to lack of insurance coverage." (*Id.* at ¶ 39). The UTI worsened, which led to Mrs. Pietryka's hospitalization on January 16, 2022. (*Id.* at ¶ 40). Mrs. Pietryka was subsequently diagnosed with sepsis secondary to her untreated UTI. (*Id.* at ¶ 41). She spent seven days in the hospital and was discharged on January 22, 2022. (*Id.* at ¶ 42). "Mrs. Pietryka was not covered under insurance during this time and her hospital bills totaled approximately $58,500.00, which understandably alarmed her." (*Id.* at ¶ 43). Her Patient Registration Form from Moses Taylor Hospital reflects the absence of insurance coverage as follows: "Prior Insurane [sic] inactive as 10-1-21 tried to call patient on phone for new insurance." (*Id.* at ¶ 44).

Mrs. Pietryka's health insurance coverage was eventually reinstated by the end of January 2022. (*Id.* at ¶ 45). Since her hospitalization in January 2022, Mrs. Pietryka continues to treat with doctors regarding complications for her sepsis diagnosis, including screening for multiple sclerosis. (*Id.* at ¶ 46). As part of this screening, Mrs. Pietryka had a magnetic resonance imaging ("MRI") scan of her lumbar spine on March 11, 2022, an EMG/NCS test on April 13, 2022, an MRI scan cervical spine without contrast on May 13, 2022, and an MRI scan of brain ataxic gait on July 28, 2022. (*Id.* at ¶ 47). Mrs. Pietryka has also "been dealing with discomfort across both hips and proximal leg areas," "stumbling,

5

catching her right toe," "having a hard time with balance and... feeling unsteady," "diffuse weakness in her arms," "aching pain into the anterior thighs bilaterally," and "having a hard time standing and ambulating" all since her sepsis diagnosis. (*Id.* at ¶ 48). "Mrs. Pietryka's medical issues continue to-date." (*Id.* at ¶ 49).

In addition to her health coverage lapse, Mrs. Pietryka has also incurred damages in the form of lost wages and the inability to accrue leave stemming from the incorrect WC hard coding. (*Id.* at ¶ 50). "Specifically, Mrs. Pietryka did not get paid for the pay period ending September 11, 2021 and for both pay periods in November 2021." (*Id.* at ¶ 51). Mrs. Pietryka's LES for the pay period ending November 20, 2021 incorrectly reflects that she took eight (8) or nine (9) hours each day between November 8, 2021 and November 19, 2021 for WC. (*Id.* at ¶ 52). However, "Mrs. Pietryka was on WC from September 13, 2021 until November 8, 2021, and returned to duty on November 9, 2021." (*Id.* at ¶ 53). A letter from the Defense Finance and Accounting Service, dated December 18, 2021, incorrectly states that Mrs. Pietryka was overpaid for the period of September 11, 2021, because she was also collecting sick leave. (*Id.* at ¶ 54). Mrs. Pietryka has been working diligently to rectify these payment issues and discrepancies for years, but still has not been made whole despite TYAD Human Resources members recognizing the mistake and acknowledging that Mrs. Pietryka is correct. (*Id.* at ¶ 55).

On or about May 11, 2023, Mrs. Pietryka filed a Claim for Damage, Injury or Death, Standard Form 95, with TYAD in the amount of $284,005.72, along with supporting

documents. (*Id.* at ¶ 56). On or about August 17, 2023, David F. Pietryka and David P. Pietryka also filed Claims for Damages, Injury, or Death, Standard Form 95 with TYAD in the amount of $25,000 each, along with supporting documents. (*Id.* at ¶ 57). "By letter dated December 20, 2023, the Department of the Army denied the Pietrykas' claims, which is the final denial of the administrative claims. See 28 C.F.R. ¶ 14.9." (*Id.* at ¶ 58).

"The foregoing demonstrates the Government's negligence in failing to restore Mrs. Pietryka's health insurance—after it was wrongfully cancelled—and return-to-duty." (*Id.* at ¶ 59). "The foregoing demonstrates the Government's negligence in failing to end the WC hard coding on or about November 9, 2021, which led to Mrs. Pietryka's lost wages and inability to accrue leave. (*Id.* at ¶ 60). "The foregoing demonstrates that Mrs. Pietryka's sepsis diagnosis, continuing complications from same, and her inability to obtain required prescriptions would not have occurred but for the negligent acts of TYAD employees acting within the scope of their employment." (*Id.* at ¶ 61). "The foregoing demonstrates that David F. Pietryka's inability to obtain his required medications, including medications necessary to help manage his Type II diabetes, would not have occurred but for the negligent acts of TYAD employees acting within the scope of their employment." (*Id.* at ¶ 62). "The foregoing demonstrates that David P. Pietryka's inability to schedule his necessary surgery on January 12, 2022, causing a two (2) month delay, would not have occurred but for the negligent acts of TYAD employees acting within the scope of their employment." (*Id.* at ¶ 63).

## III.   STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction. They possess only that power

authorized by Constitution and statute, which is not to be expanded by judicial decree."

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d

391 (1994) (internal citations omitted).

> [T]he federal courts are without power to adjudicate the substantive claims in a
> lawsuit, absent a firm bedrock of jurisdiction. When the foundation of federal
> authority is, in a particular instance, open to question, it is incumbent upon the
> courts to resolve such doubts, one way or the other, before proceeding to a
> disposition of the merits.

*Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir. 1977).

"[T]he burden of establishing the [existence of subject-matter jurisdiction] rests upon the

party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted).  Since

the federal courts' jurisdiction is strictly limited by Constitution and statute, "[i]t is to be

presumed that a cause lies outside this limited jurisdiction." *Id.*

A motion to dismiss for lack of subject-matter jurisdiction is properly made under

Federal Rule of Civil Procedure 12(b)(1).  "A district court has to first determine, however,

whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at

issue, because that distinction determines how the pleading must be reviewed."

*Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).

> A facial attack, as the adjective indicates, is an argument that considers a claim
> on its face and asserts that it is insufficient to invoke the subject matter
> jurisdiction of the court because, for example, it does not present a question of
> federal law, or because there is no indication of a diversity of citizenship among

the parties, or because some other jurisdictional defect is present. Such an attack can occur before the moving party has filed an answer or otherwise contested the factual allegations of the complaint. A factual attack, on the other hand, is an argument that there is no subject matter jurisdiction because the facts of the case – and here the District Court may look beyond the pleadings to ascertain the facts – do not support the asserted jurisdiction.

*Id.* at 358.

When a party files a motion attacking jurisdiction prior to filing an answer to the complaint or otherwise presenting competing facts, the motion is "by definition, a facial attack." *Aichele*, 757 F.3d at 358. Where, as here, the Defendant presents a facial attack on the court's subject matter jurisdiction, "we treat the allegations of the complaint as true and afford the plaintiff the favorable inferences to be drawn from the complaint." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001).

## IV.   ANALYSIS

Defendant moves to dismiss this matter for lack of subject-matter jurisdiction on the theory that Plaintiffs claims are precluded by the Civil Service Reform Act, 5 U.S.C. § 1101 *et seq.* ("CSRA").[2]  (Doc. 5).

### A. The Civil Service Reform Act Does Not Preclude Plaintiffs' FTCA Claim

Defendant moves to dismiss Plaintiffs' FTCA claim alleging negligence by arguing that the CSRA precludes the district court from reviewing Plaintiffs' claims. The CSRA, "governs the rights and obligations of most federal employees." *Manivannan v. United*

---

[2]     The Court and all parties agree that Defendant has presented a facial attack on the Complaint. (Doc. 6 at 4); (Doc. 7 at 7).

*States Dept. of Energy*, 42 F.4th 163, 169 (3d Cir. 2022). The CSRA "provides exclusive administrative and judicial review procedures for disputes falling in its ambit." *Id.* The statutory framework of the CSRA offers "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445, 108 S.Ct. 688, 98 L.Ed.2d 830 (1988)). "It does so by channeling certain employment disputes—primarily, those arising from 'actions based on unacceptable job performance,' 'adverse action[s],' and 'prohibited personnel practices'—to the Merit System Protection Board, with judicial review of its decision available in the U.S. Court of Appeals for the Federal Circuit." *Manivannan*, 42 F.4th at 170 (quoting *Fausto*, 484 U.S. at 445-47).

In *Manivannan*, the Third Circuit rejected the Government's argument that the CSRA "blocks district court review whenever the plaintiff's status as a federal employee is central to his complaint." 42 F.4th at 171. Rather, the Circuit found that "[t]he language of the CSRA itself supports a more tailored approach." *Id.* The CSRA "funnels only certain employment disputes to the Protection Board. An employee may, for instance, appeal to it 'adverse actions' defined to include certain removals, suspensions, furloughs, and reductions in grade or pay." *Id.* (citing 5 U.S.C. § 7512).

In addition, the CSRA "provides for administrative review of '[p]rohibited personnel practices,' meaning any 'personnel action' motivated by an impermissible ground, including

whistleblower reprisal and discrimination unrelated to the employee's work performance."

*Id.* (quoting 5 U.S.C. § 2302(a)(1), (b)(1)-(14)). The statute specifically notes covered

personnel actions:

> (2) For purposes of this section—
>
>> (A) "personnel action" means—
>>
>>> (i) an appointment;
>>>
>>> (ii) a promotion;
>>>
>>> (iii) an action under chapter 75 of this title or other disciplinary or corrective action;
>>>
>>> (iv) a detail, transfer, or reassignment;
>>>
>>> (v) a reinstatement;
>>>
>>> (vi) a restoration;
>>>
>>> (vii) a reemployment;
>>>
>>> (viii) a performance evaluation under chapter 43 of this title or under title 38;
>>>
>>> (ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph;
>>>
>>> (x) a decision to order psychiatric testing or examination;
>>>
>>> (xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; and
>>>
>>> (xii) any other significant changes in duties, responsibilities, or working conditions.

5 U.S.C. § 2303(a)(2)(A)(i)-(xii).

As noted by the Third Circuit, "[t]he Government points to no statutory language suggesting that any dispute primarily involving a plaintiff's federal employment needs to be heard by the Protection Board.  Congress has instead carefully defined the types of employment actions subject to the CSRA's review scheme, and these statutory definitions must guide the preclusion analysis." *Manivannan*, 42 F.4th at 172.  Accordingly, "when assessing whether the CSRA bars federal jurisdiction over an otherwise reviewable claim, courts should look to the specific underlying conduct being challenged to determine whether that conduct is an employment action covered by the statute." *Id.*  The Court's jurisdictional analysis "must be tied to the employment actions set out; the mere fact that the challenged conduct occurred in the federal employment context is not enough to bring it within the CSRA's exclusive ambit." *Id.*

Defendant seeks dismissal of Plaintiffs' Complaint for failure to comply with the CSRA.  (Doc. 6).  Specifically, Defendant claims that because Plaintiffs "seek damages for losing a benefit of federal employment, Helen Pietryka's medical insurance . . . they must follow the procedures of the CSRA, and this Court should dismiss the Pietryka's complaint for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure." (*Id.* at 2).  Defendant further claim that "[a]n alleged prohibited personnel practice of denying medical benefit is well within the statutory structure of the CSRA.  Section 2302 provides examples of 'prohibited personnel practice[s]' and specifies that 'a decision concerning pay,

benefits, or awards' falls under that definition." (*Id.* at 6). Moreover, Defendant correctly

acknowledges that "[n]ot all claims arising out of federal employment . . . are preempted by

the CSRA." (*Id.* at 5).

Plaintiffs oppose Defendant motion and argue that the CSRA does not preclude their

claims under either the FTCA or the PWPCL. (Doc. 7). Specifically, Plaintiffs argue that the

CSRA does not preclude their claims because they "do not raise any 'adverse actions,' as

Mrs. Pietryka was not removed, suspended, furloughed, or reduced in grade or pay." (*Id.* at

10). They further claim that they "do not raise any '[p]rohibited personnel practice,' including

'any personnel action motivated by an impermissible ground, including whistleblower

reprisal and discrimination unrelated to the employee's work performance" and further "do

not raise any 'personnel actions.'" (*Id.*). Plaintiffs submit that they "properly exhausted their

administrative remedies by timely filing Claims for Damage, Injury or Death (Standard Form

95) with TYAD, which were denied on or about December 20, 2023."[3] (*Id.*). Plaintiffs

further claims that "[i]n its denial letter, the Government *acknowledged* that the Pietryka's

"may file suit in an appropriate United States District Court no later than six months from the

date of the mailing of this letter." (Doc. 7 at 11) (citing Doc. 1 at ¶ 58) (emphasis in original).

---

[3]    28 C.F.R. § 14.2(a) provides, in part, that "a claim shall be deemed to have been presented when a
Federal agency receives from a claimant . . . an executed Standard Form 95 . . . accompanied by a claim
for money damages in a sum certain for injury to or loss of property, personal, or death...". Moreover, it is
well-settled that "Standard Form 95 is used to present claims against the United States under the FTCA."
*Garcia v. United States*, No. 3:17-cv-1910, 2023 WL 8281686, at *2 n.4 (M.D. Pa. Nov. 30, 2023) (citing
*Roma v. United States*, 344 F.3d 352, 358 (3d Cir. 2003)).

Accepting Plaintiffs' factual allegations as true, as it must, the Court cannot say at

this stage of the proceeding that it lacks subject-matter jurisdiction over Plaintiffs' FTCA

claim alleging negligence. The face of Plaintiffs' Complaint does not demonstrate that

Plaintiffs' FTCA claim alleging negligent termination of her health insurance is precluded by

the CSRA. Indeed, none of the facts alleged appear to involve personnel decisions or

personnel actions constituting a prohibited personnel practice such that the CSRA applies

on the face of Plaintiffs' Complaint.[4] *See Manivannan*, 42 F.4th at 172 (noting the CSRA

"provides for administrative review of '[p]rohibited personnel practices,' meaning any

'personnel action' ***motivated by an impermissible ground***, including whistleblower reprisal

and discrimination ***unrelated to the employee's work performance*****.") (emphasis added).

Rather, the Complaint alleges that Defendant negligently and mistakenly terminated Mrs.

Pietryka's health insurance which caused injury and loss through a series of administrative

and clerical errors and omissions unrelated to any decision by her employer covered by the

CSRA. Plaintiffs further allege that they properly submitted a Standard Form 95, which was

denied, and was informed that they had six months to file a complaint in federal district court

under the FTCA. (Doc. 1 at ¶¶ 56-58).

Because the Court cannot grant Defendant's the relief it seeks on the face of

Plaintiffs' Complaint, it must deny Defendant's motion. However, should new factual

---

[4]    Most, if not all, of the cases cited by Defendant to support its motion involved facts where the federal employee was challenging a termination, suspension, transfer, or downgrade in pay or grade. Moreover, it is unclear how the facts alleged by Plaintiffs resulted from any "decision" on "benefits," as Defendant claims.

material become available to demonstrate that the Court lacks subject-matter jurisdiction, the Court may grant the requested relief at a later stage of the proceedings. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determinates at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Accordingly, Defendant's motion to dismiss Count I for lack of subject-matter jurisdiction will be denied.

## B. Pennsylvania Wage Payment & Collection Law

In Count II, Plaintiffs purport to bring a claim against the United States for violation of the PWPCL. According to Plaintiffs, this Court has jurisdiction to hear this claim pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367(a). (Doc. 7 at 13 n.3). Defendant, in contrast, claims that "[s]eparate actions under state law like claims under the Pennsylvania Wage Payment and Collection Law are not cognizable against the United States and plaintiffs may only sue the United States under the Federal Tort Claims Act for state law claims." (Doc. 6. at 2-3 n.1).

"As a sovereign, the United States may not be sued without its consent." *Richards v. United States*, 176 F.3d 652, 654 (3d Cir. 1999). "The FTCA waives the federal government's sovereign immunity with respect to tort claims for money damages." *Bear v. United States*, 722 F.3d 168, 172 (3d Cir. 2013) (citing U.S.C. § 1346(b)(1)). The FTCA vests exclusive jurisdiction in district courts for claims against the United States for money damages involving "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting

15

within the scope of his office or employment, under circumstances where the United States,

if a private person, would be liable to the claimant in accordance with the law of the place

where the act or omission occurred." 28 U.S.C. § 1346(b)(1)).

Here, it is apparent that Plaintiffs cannot bring a claim against the United States for

alleged violations of the PWPCL by alleging this Court has supplemental jurisdiction to hear

this claim. The United States has not waived its sovereign immunity for state law claims not

sounding on tort and the Court cannot exercise supplemental jurisdiction over the PWPCL

claim against the United States. Notably, the case law only permits courts to exercise

supplemental jurisdiction in FTCA claims against non-governmental defendants. *See*

*Tomlin v. Pease*, Civil Action No. 14-202, 2014 WL 1340624, at *6 (E.D. Pa. Apr. 4, 2014)

(noting that in FTCA claim against United States, "the court will exercise supplemental

jurisdiction over Tomlin's claim against the Non-Federal Defendants")); *see also Peronis v.*

*United States*, No. 2:16-cv-01389, 2018 WL 4740170, at *3 (W.D. Pa. Oct. 2, 2018)

("Jurisdiction in this case is thus proper against the federal government and its agents under

the FTCA. Jurisdiction is likewise proper against the remaining [non-federal] defendants

based on supplemental jurisdiction."). Plaintiffs do not bring any claim against non-

governmental defendants and sue only the United States for alleged violations of PWPCL.

And both parties fail to direct the Court to any case where the United States has been sued

in federal court for alleged violations of the PWPCL. Accordingly, Defendant's motion will

be granted because the Court lacks jurisdiction over the claim alleged in Count II of the

Complaint. Count II will be dismissed without prejudice to allow Plaintiffs to file this claim in an appropriate forum.

## V.   CONCLUSION

For the foregoing reasons, Defendant's motion will be granted in part and denied in part. A separate Order follows.

Robert D. Mariani
United States District Judge